**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JACEK REICH | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 08 C 5810 |
| | ) |
| MICHAEL J. ASTRUE, | ) Magistrate Judge Morton Denlow |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Claimant Jacek Reich ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Defendant" or "Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB"). Claimant raises the following issues in support of his motion: (1) whether the ALJ properly considered the evidence produced by Claimant's treating psychiatrist in his finding of Claimant's residual functional capacity ("RFC") and in posing hypothetical questions to the Vocational Expert; and (2) whether the ALJ's credibility finding regarding Claimant's testimony was patently wrong. For the following reasons, the Court grants Claimant's motion for summary judgment or remand and remands the case to the Commissioner for further proceedings consistent with this opinion.

## I. BACKGROUND FACTS

**A.   Procedural History**

Claimant initially applied for DIB on May 23, 2005, alleging a disability onset date of June 30, 2002. R. 43. The Social Security Administration ("SSA") denied his application on August 15, 2005. R. 55-59. Claimant then filed a request for reconsideration, which was denied on December 19, 2005. R. 47, 51-54. Thereafter, Claimant requested a hearing before an ALJ. R. 45-46.

On May 9, 2007, Administrative Law Judge Kenneth E. Stewart ("ALJ") presided over a hearing at which Claimant appeared with his attorney, Sandra Dye. R. 205-56. In addition to Claimant and his attorney, Dr. John Cavenagh, a medical expert, and Cheryl Hoiseth, a vocational expert, also testified at the hearing. *Id.* On October 25, 2007, the ALJ issued a decision finding Claimant was not disabled under the Social Security Act. R. 13-24. Specifically, the ALJ found Reich had "the residual functional capacity to perform simple repetitive unskilled light work," and that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." R. 20, 23.

Claimant then filed for a review of the ALJ's decision to the Appeals Council, which denied Claimant's request on August 7, 2008. R. 5-7. Therefore, the ALJ's decision became the final decision of the Commissioner. Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).

**B.   Hearing Testimony – May 9, 2007**

### 1. Jacek Reich – Claimant

At the time of the hearing, Claimant was 49 years old, married, and living with his wife, 23-year-old daughter, and 18-year-old son. R. 210-11. Claimant completed education through high school and attended college for a few months. R. 211. Claimant's past relevant work experience was as a computer operator and PC analyst for a metal wholesaler, Castle Metals. R. 211-12. Claimant has not worked since June 30, 2002, when his employment was terminated. R. 211, 218. Claimant was told "more or less" that he wasn't "fitting in with the job," but the company was letting everyone go and went under a month later. R. 218. Claimant's prior duties required him to spend approximately 55% of his time moving around, picking up boxes and computer hardware weighing 25 to 40 pounds frequently, and occasionally lifting packages in excess of fifty pounds. R 212-14. Claimant performed some supervisory duties. R. 215.

Claimant testified regarding a number of medications he was being prescribed by Dr. Michael Cohan. R. 116, 227. Among others, Claimant took Lithium for depression and Xanax for anxiety, in order to not "get freaked out by everything." R. 227. The Xanax was helping, but Claimant said he had been taking more of it "as of late." R. 228.

According to Claimant, he began experiencing symptoms of bipolar disorder in 1978 or 1979. R. 234. After some unsuccessful treatment, Claimant underwent electroshock therapy in 1978 or 1979. R. 235. Claimant underwent approximately thirty-five sessions, and was subsequently able to work successfully, while on medication, for a number of years. *Id*. Claimant was diagnosed as manic-depressive with bipolar disorder at that time. R. 235-

36. Claimant's condition was more even and well-controlled while on his prescribed medication, although he did still have some periods of mania and depression. R. 236-37. Claimant testified his condition has been "fairly good, . . . minus a few episodes here and there" since coming under the care of Dr. Timothy Cullinane. R. 237.

Claimant testified to having problems with short-term memory loss. R. 238. Claimant also claimed to have problems interacting with others. R. 238-40. He testified he sometimes avoids going out of the house out of fear that he may hurt somebody. R. 239.

On a typical day, Claimant performs simple, light chores around the house, such as laundry, light cleaning and yard work. R. 239, 246. He sometimes visits with family members, grocery shops once or twice a week, and interacts with his wife and children. R. 239. Claimant had been providing care for his mother, who suffered from Alzheimer's, for approximately four years. R. 246.

Claimant testified he had been experiencing less stress since he had stopped working. R. 246-47. When the ALJ asked him if he had the ability to do "mentally easy jobs," Claimant responded "anything is possible I guess." R. 247. "[I]t would have to be a job that, you know, nobody interfered with me, they left me alone, they gave me work to do, I'd do my work and, you know I didn't have to answer to too many people about it." *Id*.

## 2. Dr. John Cavenagh – Medical Expert ("ME")

The Medical Expert, Dr. John Cavenagh, found no physical impairment that would preclude Claimant from working. R. 223. The ME referenced Claimant's medical records, in particular a visit to a cardiologist, Dr. Andrew Rauh, who examined Claimant in March 2003 as a follow-up to his 1999 quadruple bypass and reported Claimant was doing well and was not experiencing any chest pain or shortness of breath. R. 132, 223. In May 2005, Claimant was examined by his treating physician, Dr. Cohan, who also described Claimant as "doing well." R. 224. Further, the ME noted Claimant was given a psychiatric evaluation in June 2005 by Dr. Vanessa Chang, who found that Claimant suffered from bipolar disorder, Type I, and that Claimant felt stable "as long as he takes his medications." *Id.*

The ME then discussed the RFC provided by Dr. Cohan in October 2005. R. 224-25. The ME regarded this RFC as "a rather draconian assessment" asserting that Claimant is incapable of even "low-stress jobs and is very unstable mentally," and found that it was "not supported by other evidence in the files." R. 224. The ME also discussed the RFC provided by Dr. Cullinane, which found Claimant was capable of low-stress jobs, but went on to say Claimant may miss work four or more days per month. R. 225. The ME highlighted inconsistencies between "the disturbance with attending work and the actual physical and mental diagnoses." *Id.*

The ME acknowledged Claimant had experienced significant physical health problems in the past, including the quadruple bypass in 1999, but said Claimant has "had a favorable course subsequently." *Id.* The ME described Claimant's bipolar disorder as "controlled

fairly well with medications." R. 226. Overall, considering Claimant's medical records, the ME did not find that "either the mental or physical disorders meet or equal a listing." *Id*. The ME found nothing in Claimant's records that would justify the conclusions reached by Dr. Cohan or that would limit Claimant to the extent stated in Dr. Cohan's RFC. R. 228.

### 3. Cheryl R. Hoiseth – Vocational Expert ("VE")

The Vocational Expert, Cheryl Hoiseth, characterized Claimant's past relevant work experience as skilled, sedentary, and heavy in exertion as performed. R. 221-22. The VE listed a number of jobs for which Claimant may have had transferrable skills, including user support analyst, systems analyst, and programmer analyst. R. 248-49. All of these jobs are sedentary and skilled. *Id*.

The VE then provided a list of sedentary, light, unskilled positions. R. 250. The VE listed cleaner/housekeeping, grounds maintenance, assembler, packaging machine tender, and hand packager. *Id*. These jobs were characterized as simple and repetitive. *Id*. The VE opined that employers for these positions would tolerate sick leave absences "less than three times per month, ranges 1.6 to 1.8 days per month." R. 251. These positions required a worker to deal with people "minimally, infrequently." R. 252. The VE discussed limitations identified by Dr. Cullinane, Claimant's psychiatrist, including "seriously limited, but not precluded" ability to remember work-like procedures; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; and complete a normal workday and workweek without interruptions from psychologically-based symptoms. R. 253-55. Such limitations would not preclude

Claimant from obtaining employment, according to the VE, but would likely result in difficulty keeping the job. R. 254-55. Such limitations would likely cause Claimant to be "an unreliable worker." R. 255.

## C. Medical Evidence

### 1. Treatment at the Elmhurst Clinic

Claimant's medical file on record dates back to January 2002, at which time he was examined by Dr. Maelen Pantano ("Dr. Pantano"). R. 126. Claimant was described as having bipolar affective disorder. *Id*. At that time, Dr. Pantano expressed a need for Claimant to seek psychiatric follow-up "because of his condition which is significant, although, stable." *Id*.

Claimant saw Dr. Pantano again in November 2002. R. 125. At this time, Dr. Pantano again recognized Claimant's bipolar disorder, and described Claimant as "a very pleasant gentleman who is in no acute distress." *Id*. Dr. Pantano discussed her referral of Claimant to a cardiologist and a psychiatrist, and ordered Claimant to return for annual examinations. *Id*. Dr. Pantano also observed that, "[c]ardiac-wise, the patient denies any chest pain or shortness of breath." *Id*.

Claimant was examined by Dr. Eileen Schedel ("Dr. Schedel"), also at the Elmhurst Clinic, in December 2003. R. 122-24. Dr. Schedel performed a physical examination and

reported Claimant suffered from bipolar disorder, hypercholesterolemia,[1] hypertension,[2] tobacco abuse, and coronary artery disease ("CAD").[3] R. 122. Dr. Schedel refilled Claimant's prescriptions and referred him to Dr. Cohan for future examinations and treatment. *Id*. At this time, Claimant denied having any chest pain or shortness of breath, and stated, "in general, he is actually feeling fairly well." *Id*.

In January 2004, Claimant was examined by Dr. Michael Cohan ("Dr. Cohan"). R. 121. Dr. Cohan discussed Claimant's diabetes, and developed a treatment plan to deal with his high blood sugar. *Id*. According to Dr. Cohan's exam notes, "[Claimant] is otherwise doing fine." *Id*. Two weeks later, Claimant arrived for a follow-up, at which time Dr. Cohan further discussed diabetes with him. *Id*. Claimant was "stable" and "doing fine." *Id*. Dr. Cohan saw Claimant again in February, April, and July 2004. R. 117-20. During these visits, Dr. Cohan refilled Claimant's prescriptions and noted Claimant's diabetes had become well-controlled. R. 117-18. At the July exam, Dr. Cohan noted "psychiatrically," Claimant was doing well. R. 118. Dr. Cohan also examined Claimant in March 2005, at which time

---

[1] Hypercholesterolemia is a medical condition characterized by the presence of high levels of cholesterol in the blood. http://ghr.nlm.nih.gov/condition=hypercholesterolemia.

[2] Hypertension, also referred to as high blood pressure, is a medical condition in which the blood pressure is chronically elevated. http://ghr.nlm.nih.gov/glossary=hypertension.

[3] CAD is a disease in which there is a narrowing or blockage of the coronary arteries (blood vessels that carry blood and oxygen to the heart). Coronary heart disease is usually caused by atherosclerosis (a build up of fatty material and plaque inside the coronary arteries). The disease may cause chest pain, shortness of breath during exercise, and heart attacks. The risk of coronary heart disease is increased by having a family history of coronary heart disease before age 50, older age, smoking tobacco, high blood pressure, high cholesterol, diabetes, lack of exercise, and obesity. http://ghr.nlm.nih.gov/glossary=coronaryarteriosclerosis.

Claimant was feeling well, with some adjustments needed for his diabetes treatment. R. 114. In June 2005, Claimant was again "doing well," although Dr. Cohan expressed concern over Claimant's refusal to quit smoking despite his past heart problems. *Id.*

In October 2005, Claimant was noted to be "very fatigued and depressed lately." R. 176. Dr. Cohan recommended Claimant see his psychiatrist, Dr. Cullinane, to talk about things. *Id.* Dr. Cohan also completed a Physical Residual Functional Capacity Questionnaire at this time. R. 171-74, 176. He described his contact with Claimant as "every two months." R. 171. Claimant's prognosis was "poor" and Dr. Cohan diagnosed Claimant as suffering from bipolar disorder, diabetes, emphysema, and heart disease. *Id.* Claimant's symptoms were described as "frequent chest pain, shortness of breath, depression, and anxiety." *Id.* Dr. Cohan wrote that Claimant's experience of pain or other symptoms were "constantly" severe enough to interfere with attention and concentration needed to perform even simple work tasks. R. 172. Claimant was said to be "incapable of even 'low stress' jobs" because he was "very mentally unstable." *Id.* Dr. Cohan estimated Claimant would likely be absent from work "more than four times a month" due to his impairments. R. 174.

Dr. Cohan examined Claimant again in April 2006, at which time Claimant was described as "stable." R. 191. Claimant was admonished for not checking his blood sugar often enough, and for continuing to smoke. *Id.* Claimant had recently been examined by a cardiologist, Dr. Rauh, who reported "normal cardiac function." *Id.* In February 2007, Claimant was said to be "doing well," and, despite not checking his sugars, his diabetes was doing well. R. 192. Claimant was still taking the same medications and was "feeling good,

9

no chest pain or shortness of breath." *Id*. In April 2007, Claimant was "stable" and "politely" refused to stop smoking. R. 193.

In May 2007, Dr. Cohan filled out another Physical Residual Functional Capacity Questionnaire on behalf of Claimant. R. 186-90. Claimant's prognosis was "poor" and his symptoms were "frequent chest pain, shortness of breath, depression, and anxiety." R. 186. Claimant's symptoms were said to interfere with his attention and concentration "frequently," and Claimant was found to be "capable of low stress jobs." R. 187. Claimant was likely to miss work "about three days per month" due to his impairments. R. 189.

### 2. Dr. Timothy Cullinane – Claimant's Treating Psychiatrist

After his previous psychiatrist, Dr. Lieghhio, moved out of town, Claimant began seeing Dr. Timothy Cullinane ("Dr. Cullinane"), a psychiatrist, in September 2005. R. 169, 195. Dr. Cullinane diagnosed Claimant as "Bipolar Disorder, Type 1, most recent episode manic, without psychotic features." R. 169. Claimant's disorder was described as "gets manic slowly, then worse." *Id*. Claimant was having difficulty sleeping through the night and his mood during the examination was "even keel; energy not bad; concentration ok." *Id*.

Claimant continued to see Dr. Cullinane through the time of his hearing in May 2007. R. 184, 195. In January 2006, Claimant said "I've had better decades" and expressed concern over his son's drug use and other problems. R. 184. At that time, Claimant's mood was "down." *Id*. Dr. Cullinane saw Claimant in April, August, and December 2006. R. 184-85. Claimant's mood was described as "good, stable" and "not too bad." R. 184. Claimant continued to have trouble sleeping but his energy level was "ok." R. 184-85. In March

2007, Claimant had been taking a higher dose of Desipramine for seven to eight weeks and his mood was better. R. 185. Claimant was anxious about moving with his family, and said that "things will be better" once they moved. *Id*.

In May 2007, Dr. Cullinane completed a Mental Residual Functional Capacity Questionnaire on behalf of Claimant. R. 195-201. He described Claimant as having become more depressed recently due to his mother's declining health and "chronic problems managing his son." R. 195. Claimant's depression was "not severe, but it [was] certainly not under maximum control either." *Id*. Claimant did not initially increase his dosage of Desipramine, as Dr. Cullinane had requested, because he "didn't feel like doing it." *Id*. Claimant's prognosis was "[g]ood if the patient follows aggressive medication therapy as recommended." R. 196. Claimant's depression was "affecting his interest in activities, his memory, and his ability to concentrate." *Id*. Dr. Cullinane expressed hope that "as [Claimant's] depression is treated, these seriously limited problems will go for ever [sic]." *Id*. Claimant expressed difficulty in returning to work because of the amount of time he had been away from the computer industry. *Id*. Claimant's "severe depression does interfere with his motivation, and makes him feel hopeless about ever learning enough to manage himself and his illness." *Id*. Dr. Cullinane also noted Claimant was "unable to explain to [him] why he will be unable to return to work of some other kind." *Id*.

The remainder of Dr. Cullinane's evaluation consisted of checking boxes, in which he indicated "seriously limited, but not precluded" abilities to: "remember work-like procedures;" to "maintain regular attendance and be punctual within customary, usually strict

11

tolerances;" to "sustain an ordinary routine without special supervision;" and to "complete a normal workday and workweek without interruptions from psychologically-based symptoms." R. 198. Claimant was said to have "limited but satisfactory" ability to "interact appropriately with the general public" and to "maintain socially appropriate behavior." R. 200. Claimant was likely to miss work "more than four days per month" due to his impairments. R. 201.

### 3. Dr. Vanessa Chang – State Psychiatrist

In June 2005, Claimant was examined by Dr. Vanessa Chang ("Dr. Chang"), at the behest of the SSA. R. 151-54. Claimant was "friendly, pleasant and cooperative with the interview." R. 153. Dr. Chang administered a variety of tests during the examination. R. 151-54. Claimant reported that "currently his symptoms are stable as long as he takes his medications." R. 154. He had a history of bipolar disorder with manic episodes. *Id*. Claimant's prognosis was "guarded." *Id*.

### 4. Dr. Travis Terry – State Agency Psychologist

In August 2005, Dr. Travis Terry ("Dr. Terry"), a non-examining reviewer, completed a Psychiatric Review Technique form. R. 155-67. Dr. Terry noted Claimant suffered from bipolar disorder and was manic-depressive. R. 158. Dr. Terry indicated that Claimant's mental impairments, under the category of affective disorders, were not severe. R. 155. Claimant's impairment caused a "mild" difficulty in maintaining social functioning. R. 165. According to Dr. Terry, Claimant was forgetful, and handled stress and change poorly. R. 167. Claimant was said to function well independently day to day. *Id*.

**D.     The ALJ's Decision – October 25, 2007**

Following a hearing and a review of the medical evidence, the ALJ rendered a decision denying Claimant's application for DIB. R. 13-24. The ALJ reviewed Claimant's application under the familiar five-step sequential analysis. R. 17-18; *see infra*, Part II., B. (Disability Standard). At step one, the ALJ found Claimant had not engaged in substantial gainful activity since June 30, 2002, the alleged onset date. R. 18. At step two, the ALJ found Claimant had the severe impairments of a history of coronary artery disease and bipolar disorder. *Id*. At step three, the ALJ found Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. 19. The ALJ then considered Claimant's RFC and found Claimant is capable of performing "simple repetitive unskilled light work." R. 20.

In assessing Claimant's RFC, the ALJ considered all of Claimant's symptoms and the extent to which those symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id*. The ALJ found Claimant's impairments could reasonably be expected to produce his symptoms, but that Claimant's statements "concerning the intensity, persistence and limiting effects of [those] symptoms are not entirely credible." R. 21. The ALJ noted Claimant's medications had been "quite effective" in controlling his symptoms, and that Claimant had failed to follow the advice of Dr. Cullinane in increasing the dosage of his psychiatric medication. R. 21-22. The ALJ discussed the opinion offered by Dr. Cohan, and agreed with the ME that Dr. Cohan's assessment was not supported by the medical evidence on record. R. 22. The ALJ then

13

discussed Dr. Cullinane's assessment, addressing in particular those abilities described in Dr. Cullinane's mental RFC as "seriously limited, but not precluded." *Id*. The ALJ noted that even these abilities were not precluded, and that the same report lists satisfactory ability in a number of other areas. R. 22-23. The ALJ discussed Claimant's inability to inform Dr. Cullinane of any reason why he would not be able to find any other type of work. *Id*. The ALJ concluded Claimant was able to perform simple, repetitive, light unskilled work. R. 23.

At step four, the ALJ found Claimant was unable to perform any past relevant work. *Id*. At step five, the ALJ found there are jobs that exist in significant numbers in the national economy that Claimant could perform. *Id*. Thus, the ALJ concluded Claimant was not under a disability, as defined in the Social Security Act. R. 24.

## II. LEGAL STANDARDS

### A. Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id*. Judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching his decision and whether there is substantial evidence in the record to support the findings. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge between the evidence and the result." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). It may not, however, re-evaluate the facts, "re-weigh [the] evidence . . . or substitute [its] own judgment for that of the Commissioner." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether there is substantial evidence to support the findings. *Id*. at 368-69. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**B.      Disability Standard**

Disability insurance benefits ("DIB") are available to a claimant who can establish "disability" under the terms of Title II of the Social Security Act. *Rice*, 384 F.3d at 365. An individual is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

15

. . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A disabled individual is eligible for DIB, however, only if she is under a disability. 42 U.S.C. § 423(a)(1)(E). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

To make this determination, one must employ a five step sequential analysis. 20 C.F.R. §§ 404.1520(a)-(f). Under this process, the ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful employment; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *White v. Barnhart*, 415 F.3d 654, 657 (7th Cir. 2005). Once the claimant has proven he cannot continue his past relevant work because of physical limitations, the ALJ carries the burden to show that other jobs which the claimant can perform exist in the economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

### III. DISCUSSION

Claimant raises the following issues in support of his motion: (1) whether the ALJ properly considered the evidence produced by Claimant's treating psychiatrist in his finding of Claimant's residual functional capacity ("RFC") and in posing hypothetical questions to

16

the Vocational Expert; and (2) whether the ALJ's credibility finding regarding Claimant's testimony was patently wrong. For the following reasons, Claimant's motion for summary judgment or remand is hereby granted.

A.  **The ALJ Did Not Properly Consider the Evidence Produced by Claimant's Treating Psychiatrist.**

This is a close case, turning in large part upon an interpretation of Dr. Cullinane's report. R. 195-201. As Claimant's treating psychiatrist, Dr. Cullinane noted that Claimant was not following his directions regarding the dosage of his medication. Claimant was unable to explain to Dr. Cullinane why he was unable to return to work. However, Dr. Cullinane found that Claimant's condition would cause him to miss work more than four days per month. R. 195-96, 201.

In analyzing Dr. Cullinane's report, the ALJ did not credit Dr. Cullinane's report in full because Claimant could not explain why he would be unable to return to other types of work. R. 22. Dr. Cullinane did state: "More importantly, his severe depression does interfere with his motivations, and makes him feel hopeless about ever learning enough to manage himself and *his illness*." R. 196 (emphasis added). Therefore, the essential question is whether Claimant's failure to increase his medication is volitional or simply part of his illness. The ALJ speculated that the limitations suggested by Dr. Cullinane were volitional and were intended only to apply to skilled and semi-skilled work, not to simple unrepetitive jobs.

The ALJ may be correct; however, we will never know what Dr. Cullinane intended

17

without contacting him for clarification. Since the ALJ was unsure as to the basis of the treating psychiatrist's assessment, he had an obligation pursuant to SSR 96-5p to contact Dr. Cullinane for clarification. SSR 96-5p states in relevant part:

> For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.

The ALJ should have recontacted Dr. Cullinane rather than engage in speculation. *Barnett v. Barnhart*, 381 F.3d 664, 669-70 (7th Cir. 2004) (ALJ obligated to contact treating physician when needed to flesh out report); *Wilder v. Chater*, 64 F.3d 335, 338 (7th Cir. 1995) (Claimant "entitled to a decision based on the record rather than on a hunch.")

When the VE was asked about the impact of the "seriously limited but not precluded abilities" set forth by Dr. Cullinane, her response was that the hypothetical individual was "[n]ot a candidate for the workforce. You've got an unreliable worker." R. 255. The VE's testimony underscores the importance of clarifying whether Dr. Cullinane intended his report to apply to all forms of work or only to skilled and semi-skilled work.

In explaining his RFC findings, the ALJ gave "very substantial weight" to the opinion of the medical expert, Dr. Cavenagh. R. 22. This reliance was misplaced because Dr. Cavenagh is not a mental health specialist and he left the hearing room before additional questioning and testimony of the bipolar disorder took place. R. 234. Psychiatrists are the proper experts regarding mental impairments. *Wilder*, 64 F.3d at 338. Accordingly, understanding Dr. Cullinane's report is essential in deciding this case.

18

**B.     The ALJ's Credibility Determination is Moot.**

Because this case will be remanded, the Court does not find it necessary to address the ALJ's credibility determination.  The clarification by Dr. Cullinane may impact this issue.

## IV. CONCLUSION

For the reasons set forth in this opinion, the Court grants Claimant's motion for summary judgment or remand and remands the case to the Commissioner for further proceedings consistent with this opinion.

SO ORDERED THIS 15th DAY of SEPTEMBER, 2009.

_Morton Denlow_
**MORTON DENLOW
UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

Marcie E. Goldbloom
Daley, DeBofsky & Bryant
55 West Monroe Street
Suite 2440
Chicago, IL 60603

Counsel for Plaintiff

Kathryn Ann Kelly
U.S. Department of Justice
219 South Dearborn Street
Chicago, IL 60604

John L. Martin
Assistant Regional Counsel
200 West Adams Street
Suite 3000
Chicago, IL 60606

Counsel for Defendant